# Exhibit E

## EXCLUSIVE LICENSE AGREEMENT

**DATE:**                    **December ___, 2005**

**PARTIES:**                 **POWERbahn, LLC**
Mr. Scott Radow
1340 Lincoln Road, Unit #403
Miami Beach, Florida 33139
Telephone:  (305) 495-1524
Facsimile:   (305) 437-8025
Attn: Scott Radow
("POWERbahn")

**and**

**Nautilus, Inc.**
Mr. Pat Warner
16400 SE Nautilus Drive
Vancouver, Washington  98683
Telephone: (303) 545-1485
Facsimile:   (303) 939-8495
Attn: Pat Warner
("NAUTILUS")

## RECITALS

A.       POWERbahn controls certain Intellectual Property Rights through an exclusive license from Scott Radow and desires to exclusively license the Licensed Intellectual Property to NAUTILUS for its worldwide exploitation with respect to Exercise Equipment.

B.       NAUTILUS manufactures and distributes Exercise Equipment and other products and desires to exclusively license the Licensed Intellectual Property from POWERbahn for worldwide exploitation with respect to Exercise Equipment.

## TERMS OF AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1

1.   *Definitions.*  In addition to terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below:

"Cycle Trainer Product" shall mean equipment used in combination with a bicycle for training purposes.  By way of example only, the following products are Cycle Trainer Products: Velodyne Sports Classic, Cycle-Ops Mag Trainer and 1up USA CPR A-2000 Bicycle Trainer.

"Exercise Equipment" shall mean all equipment or apparatus that is commonly used by persons to promote the physical heath and fitness of such individual.  By way of example only, "Exercise Equipment" includes equipment and apparatus designed to improve the cardio or strength fitness of an individual (whether retail or commercial), such as, elliptical trainers, treadmills, stationary bicycles and equipment that incorporates weight as resistance to an individual's physical movements, such as, an abduction, adduction machine, biceps curl, compound row, weight assistance chin dip, incline press, lateral hold/pull down, abdomen and low back equipment. Except as set forth in the definition of Licensed Product, "Exercise Equipment" does not include any of the following:  non-fitness related simulators, video and arcade games, equipment or apparatus utilized for governmental, military or space exploration purposes, motion control, and other equipment and/or apparatus whose primary purpose is not the promotion of physical health and fitness for human beings.

"Intellectual Property Rights" shall mean all United States and worldwide trademarks, service marks, trade names, trade dress, logos, trademarkable material, copyrights and copyrightable material, rights of authorship, inventions, mask work rights, rights relative to Software (as hereinafter defined), firmware, Source Code (as hereinafter defined), Object Code (as hereinafter defined), moral rights, patents, patents pending, patent applications, patentable material, rights of inventorship, all applications, registrations and renewals in connection with

2

any of the above, database rights, trade secrets, rights of publicity, privacy and/or defamation,
rights under unfair competition and unfair trade practices laws, and all other intellectual and
industrial property rights related thereto.

"Know-How" shall mean all knowledge, skill, information, advice, direction, formulas,
methods, concepts, devices, compilations of information or the like, whether secret or publicly
available, that is utilized or invented for use in or related to the Licensed Intellectual Property
and/or POWERbahn's Intellectual Property Rights, whether or not capable of being patented,
copyrighted or trademarked.

"Licensed Intellectual Property" shall mean all Intellectual Property Rights of
POWERbahn relative to its proprietary control systems for Exercise Equipment and the
associated methods,  circuitry utilized therein and Software.  Licensed Intellectual Property
includes, but is not limited to: (i) the patents and patent applications described in Exhibit A
hereto (the "Patents"), together with all patentable material and all U.S. and foreign related
patents of importation, patents of confirmation, improvement patents, provisional patents, patents
and certificates of addition and utility models, as well as division, reissue, reexamined,
continuation, continuation-in-part, applications, renewals and extensions of any of the foregoing;
(ii) copyrighted and copyrightable Software and other material incorporated into the Patents
and/or the Exercise Equipment that utilizes the Patents (the "Copyright Material"), (iii) the
trademarked and trademarkable logo, trade names, trade secrets and trade dress utilized in
relation to the Patents and/or Copyright Material and Exercise Equipment that utilizes the Patents
and/or Copyright Material, and (iv) Know How.

"Licensed Product" shall mean each product manufactured by or for NAUTILUS or any
sublicensee under this Agreement that utilizes any of the Licensed Intellectual Property or is

3

covered by any rights conferred by any government agency, Federal or State law or common

law, to POWERbahn and any equivalent thereof and any associated data that contains any of the

Licensed Intellectual Property and that utilizes or operates on or with Exercise Equipment that

contains any of the Licensed Intellectual Property, such as but not limited to a DVD product

including Modified Software or other computer programs including Licensed Intellectual

Property, manufactured by or for NAUTILUS, regardless of where such product is manufactured

and/or commercially exploited, which "associated data" includes, but is not limited to data,

Source Code, Object Code, Software, CD-ROM, DVD, interactive, internet based and other

technology whether now known or hereafter devised that provides instruction, competition or

simulation of "real life" events or activities (such as bicycle racing or riding a bicycle on an

actual course such as the first stage of the Tour de France).  This definition explicitly excludes

products, data, software, or accessories, that do not include or are not derived from the Licensed

Intellectual Property.

     "Modified Software" shall mean the Source Code modified by NAUTILUS under

Section 2 and any resulting Object Code.

     "Net Sales" shall mean the gross sales invoiced price or other revenue generating

activities payable or accrued, at the time that title or leasehold rights to each Licensed Product

transfers from NAUTILUS, any sub-licensee, or companies controlled by either to any third

party, net of freight, and less direct-to-consumer advertising and marketing costs, any credits for

actual returns and customary and ordinary course of business trade discounts actually taken all as

to Licensed Product only and as accounted for in the Royalty reports.  For purposes hereof, "Net

Sales" shall also be calculated to include gross revenues received by NAUTILUS relative to the

lease, license or other commercial exploitation of the Licensed Intellectual Property. For the

purpose of calculating Net Sales, the total actual per product advertising and marketing cost deductions that NAUTILUS is allowed to deduct in any calendar quarter shall not exceed the following percentages of NAUTILUS' Manufacturer's Suggested Retail Price ("MSRP"):

(a)   sixty percent (60%) for commercial-oriented Licensed Products (e.g., NAUTILUS to a gymnasium), commercial-oriented Licensed Products made through distributors (e.g., NAUTILUS to a distributor, who then contracts with a gymnasium), and retail-oriented Licensed Products made through retail stores (e.g., NAUTILUS to a retail store such as Sears); and

(b)   fifty percent (50%) for Licensed Products made directly to consumers (e.g., NAUTILUS to an individual consumer – whether or not purchased through a website, infomercial or otherwise).

"Object Code" shall mean the computer executable embodiment of any computer code for any software (including the Software), which is derived from the Source Code by a process generally known as "compilation" or any other process that translates the Source Code or some intermediate code derived from the Source Code into a form that can be executed by a computer.

"Software" shall mean any and all Object Code and Source Code relevant to the function and operation of the Licensed Product.

"Source Code" shall mean the human readable embodiment of any computer code for any software (including the Software), which must be translated by a process generally known as "compilation" into Object Code before such software can be executed by a computer, including, without limitation, flow charts, algorithms, production tools, programmer's notes and comments, command files and regression tests and other written instructions and explanatory or technical

materials, and any modifications, or derivatives thereof, including any localized versions thereof, that may be developed from time to time.

"Royalties" shall mean all amounts paid or payable to POWERbahn under Section 4 hereof, and shall be calculated upon Net Sales, and shall include, but are not limited to, "Quarterly Minimum Royalties," to be paid on a quarterly basis.

**2.     *License Grant***

a.  POWERbahn hereby grants to NAUTILUS an exclusive worldwide license to the Licensed Intellectual Property and the Know How in the field of Exercise Equipment; including the rights to make, have made, use, lease and/or sell, import or otherwise dispose of and fully exploit, the Licensed Product.  POWERbahn reserves all rights to the Licensed Intellectual Property in all fields other than Exercise Equipment.

b.  POWERbahn grants to NAUTILUS a non-exclusive worldwide license to the Licensed Intellectual Property for a Cycle Trainer Product, including the rights to make, have made, use, lease and/or sell, import or otherwise dispose of and fully exploit, the Licensed Product.  POWERbahn reserves all other rights relative to Cycle Trainer Products, including the right to manufacturer and distribute itself or license to third parties the rights to manufacture and distribute such items.

c.  Within the first five (5) years after NAUTILUS' introduction of its first Licensed Product (the "Additional Royalty Product Deadline"), NAUTILUS shall introduce and offer to its customers the opportunity to place orders for a second product  (a product not found in the stationary bicycle Exercise Equipment product category) that embodies the Licensed Intellectual Property, or an improvement thereon, which produces a second, additional royalty payment obligation (the "Additional Royalty Product").  In the event that

NAUTILUS does not meet the Additional Royalty Product Deadline, POWERbahn shall have the right, at its sole discretion and only if communicated in writing as provided herein, to convert the license granted under this Agreement to a non-exclusive license grant for all product categories that fall outside of the stationary bicycle product Exercise Equipment category. If, however, NAUTILUS meets this obligation before receiving POWERbahn's communication, even if NAUTILUS meets the obligation after the Additional Royalty Product Deadline has passed, NAUTILUS shall retain its exclusive rights as granted herein. In the event POWERbahn converts the Agreement to a non-exclusive license, the royalty rate for non-stationary bicycle Exercise Equipment product categories from the date notice of such conversion is received will not be greater than three percent (3%). Additionally, the Minimum Royalties will be reduced to $225,000.00 per year ($56,250.00 per quarter) commencing on the date NAUTILUS receives POWERbahn's notice of conversion. In any event, NAUTILUS shall retain its exclusive license rights with respect to the stationary bicycle Exercise Equipment product category and the royalty rate with respect thereto set forth in Section 5(a) will continue to apply to such stationary bicycle Exercise Equipment.

Nautilus's obligation to create Additional Royalty Products shall extend to each consecutive five (5) year period of the Term of the Agreement, calculated on an average basis. Additionally, each new Additional Royalty Product shall be in a different Exercise Equipment category than those already represented by existing products at the time the new Additional Royalty Product is introduced.

By way of example only, if Nautilus introduces an elliptical product that in the third year of the Agreement, it will have satisfied its obligations for the first five-year period. Similarly, if Nautilus then introduces a treadmill product as well as a home gym strength

7

product in the seventh year of the Agreement, it will have, in total, satisfied its obligations to create and introduce Additional Royalty Products for the first fifteen years of the Term of the Agreement.

      d.  POWERbahn hereby grants to NAUTILUS an exclusive worldwide license to the Software to make, have made, use, lease and/or sell, import or otherwise dispose of and fully exploit the Licensed Product; including the right to make, use, copy, modify, perform, create modifications to and create derivative works of and from the Source Code of the Software to create Modified Software and grant licenses (and sublicenses and the right to grant same) solely in connection with the use, design, improvement, manufacture, sale and distribution of the Licensed Product and grant licenses, sublicenses and the right to grant same to make, use, sell, copy, perform the Object Code solely in combination with the Licensed Product. The exclusive license granted to the Software is convertible to a non-exclusive license parallel to the conversion of exclusive rights to non-exclusive rights under Section 2c above, but such conversion is limited only to the Software and Modified Software necessary for POWERbahn to practice the non-exclusive rights converted under Section 2c above.

      e.  NAUTILUS shall have sole authority to make decisions regarding the Licensed Product, and, upon prior written consent of POWERbahn, NAUTILUS shall have the right to sublicense the Licensed Intellectual Property to third parties under this Agreement, subject to the terms and conditions herein. NAUTILUS shall obtain from each permitted sublicensee an executed writing that indicates the reading and examination of, and agreement to be bound by, the terms of this Agreement and that certain Non-Disclosure Agreement entered into between the Parties on July 12, 2005 (the "NDA"), attached as Exhibit B, and incorporated herein by this reference, except that NAUTILUS shall not be required to negotiate a sublicense

under the terms of this Section in order to make and have made prototypes of Licensed Products

and/or Licensed Products for NAUTILUS's sale and distribution.  Notwithstanding any such

sublicense, NAUTILUS shall remain fully liable for all of its obligations hereunder, and agrees

to secure appropriate agreements for the protection of Confidential Information from any

permitted sublicensee/vendor that manufactures prototypes of License Products or Licensed

Products as referenced herein.

   f.   NAUTILUS shall have the right, but not the obligation to, append to any

Licensed Product and utilize in any advertisements or promotions of such Licensed Product the

POWERbahn name, logo and/or trademark to designate the source of the control system for such

Licensed Product.  During the term of this Agreement, POWERbahn and Scott Radow shall have

the limited right to identify its/his affiliation and/or license relationship with NAUTILUS in

business plans and/or other ordinary course of business documents/agreements as well as in

books written by, resumes of and promotional materials for speaking arrangements for Mr. Scott

Radow, including the limited right to utilize royalty-free the NAUTILUS name solely in

connection therewith; provided that neither POWERbahn nor its principals will disclose the

terms of this Agreement except to its accountants, attorneys, members, managers or any other

person who has asked to know and agrees to be bound by the confidentiality obligations set forth

herein and in the NDA; and provided further that except as set forth above, neither POWERbahn

nor Mr. Scott. Radow will utilize the NAUTILUS name or logo in advertisements, promotional

materials or on websites without NAUTILUS' prior written approval of such use, which

approval or disapproval shall not unreasonably be withheld or delayed, but which shall be at

Nautilus' sole discretion.  POWERbahn shall make any request under this Section in writing to

the Notice recipient under Section 11a herein, and for the purposes of this Section e-mail is an

9

acceptable form of written request.  If no written response is sent by Nautilus to POWERbahn

after 30 days from the date of the receipt of such written request, such written request shall be

deemed approved.  For purposes of this section, electronic mail approval from an authorized

NAUTILUS representative shall be considered to be written approval.

      **3.**    ***Software Security and Restrictions***

      a.    NAUTILUS agrees that, except as may otherwise be provided herein or by

a separate written agreement between POWERbahn and NAUTILUS, at all times during and

after this Agreement it shall: (i) restrict access to the Source Code to its employees, independent

contractors and agents who have a need to know and are directly involved in the accomplishment

of the purposes of this Agreement; (ii)  to the extent any employee, independent contractor or

agent has access to the Source Code, requiring that such employee, independent contractor or

agent agree in writing to keep such information confidential; (iii)  promptly notify POWERbahn

in writing of any unauthorized access to the Source Code of which NAUTILUS management

becomes aware; and (iv) use, and cause to be used, due care when transferring, modifying,

storing and working with and on the Source Code.

      b.    NAUTILUS agrees that, for each version of the Modified Software

created by or for NAUTILUS and released for use on or with a Licensed Product ("Released

Software"), it shall provide and deliver to POWERbahn a copy of the Source Code as modified

for the Released Software that contains the aggregate of all changes and modifications made to the

Released Software since the prior version of Released Software, including a narrative of the

changes made.  By way of clarification, NAUTILUS shall not be required to provide or deliver to

POWERbahn periodic modifications as may be made to Source Code from time to time by

NAUTILUS between versions of Released Software.  Except for the license rights converted from

10

exclusive to non-exclusive under Section 2d, during the term of this Agreement and for three years beyond the termination or expiration of this Agreement, POWERbahn shall not use, utilize, or in any way transfer or license in whole or in part, either itself or through an agent or affiliate, the Modified Software for any purpose considered competitive with NAUTILUS.

**4.**     ***Representations and Warranties***

a.     POWERbahn represents, warrants and covenants to NAUTILUS that, to the best of its knowledge as of the date of this Agreement without inspection or investigation of any kind: (i) it is free to enter into this Agreement; (ii) it will not enter into any other agreement which would conflict with the terms of this Agreement; (iii) it has, and will have throughout the term of this Agreement, ownership and/or control of the Licensed Intellectual Property and Software (subject to this Agreement and the rights of NAUTILUS hereunder), free and clear of all liens and encumbrances, and the right to license the Licensed Intellectual Property to NAUTILUS in accordance with the terms and provisions of this Agreement subject to (a) future transfers or licenses granted by POWERbahn of the Licensed Intellectual Property for use in fields other than Exercise Equipment; (b) POWERbahn's rights to manufacture and distribute itself or license to third parties rights to manufacture and distribute Cycle Trainer Products; and (c) the devices and methods disclosed in the Licensed Intellectual Property do not infringe upon or violate any Intellectual Property Right of any third party.

b.     POWERbahn and NAUTILUS acknowledge that POWERbahn has delivered to NAUTILUS the most recent, reasonably error free, and functional version of the Software, POWERbahn agrees to supply the Software to NAUTILUS upon receipt of payment of the initial amounts under Section 5b, and POWERbahn further represents and warrants that the

11

Software as delivered to NAUTILUS was independently developed in its entirety by or for Scott Radow for POWERbahn.

      c.     POWERbahn shall not disparage the Licensed Product or the NAUTILUS name or the principals, employees, contractors or consultants of NAUTILUS.

      d.     NAUTILUS represents, warrants and covenants to POWERbahn, to the best of its knowledge as of the date of this Agreement without inspection or investigation of any kind as follows: (i) it is a corporation in good standing, (ii) it has corporate power and authority to enter into this Agreement; (iii) it will not enter into any other agreement which would conflict with the terms of this Agreement; and (iv) the execution, delivery and performance of this Agreement will not conflict with or violate any agreement, mortgage, indenture, license, permit, authorization, lease or other instrument by which NAUTILUS or any of its properties or assets are or may be bound, or require NAUTILUS to obtain or make any consent, authorization, approval or filing under any law, statute, rule or regulation, except those which have been obtained or completed  on or prior to the date hereof.

      e.     NAUTILUS shall not disparage the Licensed Intellectual Property, the POWERbahn name or the principals, employees, contractors or consultants of POWERbahn; provided however, nothing in this section shall restrict NAUTILUS distinguishing over the Licensed Intellectual Property in patent prosecution and trademark prosecution proceedings before the United States Patent and Trademark Office.

      f.     NAUTILUS shall make commercially reasonable efforts to promote, market and sell each Licensed Product for the term of this Agreement and any sell-off period thereafter. NAUTILUS agrees that, in order to preserve and enhance the good will associated with the Licensed Intellectual Property, the Licensed Products shall be of a quality no less than

the quality of the products currently manufactured by NAUTILUS and that the materials used to make any parts of any Licensed Products shall conform to industry standards of the time.

     **5.**    ***Royalties***

     a.    On a quarterly basis, on or before 30 days after each calendar quarter, NAUTILUS shall pay without deduction or offset to POWERbahn the Royalties in the amount of five percent (5%) of Net Sales generated in the immediately proceeding calendar quarter. By way of example only, at the end of April 2006, NAUTILUS will pay POWERbahn Royalties in the amount of 5% of Net Sales generated from January 1, 2006, through March 31, 2006.

     b.    The Minimum Annual Royalty Payments shall be calculated beginning on January 1, 2006, shall be paid in equal quarterly amounts (the "Quarterly Minimum Royalties") to POWERbahn, and shall be as follows:

| | | |
|---|---|---|
| I. | Initial signing bonus (paid within 10 days after execution of this Agreement): | $ 87,500.00 |
| II. | January 1, 2006 to December 31, 2006: | $150,000.00 |
| III. | January 1, 2007 to December 31, 2007: | $175,000.00 |
| IV. | On or subsequent to January 1, 2007: | $250,000.00 |

     c.    Each Minimum Annual Royalty Payment associated with a particular calendar year may be applied against Royalties otherwise due and payable during that same calendar year.

     d.    Royalties shall be computed and paid quarterly by NAUTILUS, and within 30 days after the end of each calendar quarter, NAUTILUS shall send POWERbahn (i) a report of transactions involving the Licensed Product in the applicable quarter; and (ii) payment for Royalties due. Royalty reports shall include, at a minimum, the gross sales relative to and the quantity of Licensed Products sold or leased by Licensee in such quarter, including an identification of each Licensed Product type, any credits or offsets (including related deductions,

13

returns and allowances) claimed by Licensee, the aggregate amount of Net Sales from all sources, the calculation of the Royalty and the total Royalty amount due Licensor, and a brief status of product development efforts, in a form mutually agreeable to the parties.

e.     NAUTILUS shall keep records according to generally accepted accounting principles and sufficient to enable POWERbahn to confirm proper calculation of the Royalties. POWERbahn (whether directly or though an authorized representative) shall have the right to inspect Licensed Products and NAUTILUS's records (including those at sublicensees and parties associated with NAUTILUS) relating to (i) the Licensed Product, (ii) the computation of Royalties, and (iii) Nautilus' performance under Section 3 above.  Inspections of records and Licensed Products may be made no more often than once per year, unless previously agreed upon by NAUTILUS in writing. Such inspections shall be on not less than 48 hours advance notice, on a date agreed upon by the parties and sensitive to NAUTILUS regulatory reporting requirements, and during NAUTILUS' normal business hours.  Such inspections, the results of which shall be provided to NAUTILUS within thirty (30) days after the completion of the audit, shall be at POWERbahn's expense, unless any such inspection reveals an underpayment by NAUTILUS of more than five percent (5%); in which case NAUTILUS shall pay all of POWERbahn's costs of the inspection.

In the event of any underpayment of Royalties, NAUTILUS shall pay the amount of underpayment within fifteen (15) days of its confirmation of the contents of POWERbahn's reasonably detailed statement of underpayment plus interest thereon at prime rate per annum accrued from the date that such amount underpaid should have been paid to POWERbahn until the date of actual payment.  In no event shall the interest paid thereon exceed twelve percent (12%) per annum.

14

In the event of any non-performance by NAUTILUS under Section 3 above, Nautilus shall correct such non-performance within fifteen days of its confirmation of the contents of POWERbahn's reasonably detailed statement of non-performance.

NAUTILUS shall have thirty (30) days to confirm the contents of POWERbahn's statement; if it fails to confirm the statement of underpayment or non-performance within that time, the statement shall be considered to be accepted and payment or corrective action shall be due as stated above.  In the event of a disagreement concerning the statement, NAUTILUS shall pay or take corrective action regarding the agreed upon portion of the statement as stated above and the parties agree to engage in a good faith effort to resolve the disputed portion of the statement.

In the event of any overpayment of Royalties, POWERbahn shall pay the amount of overpayment to NAUTILUS on the later of: (i) the date of its next receipt of a Royalty payment; or (ii) forty-five (45) days of the completion of its audit, plus interest thereon at prime rate per annum accrued from the date of NAUTILUS's overpayment.  In no event shall:  (1) interest be due relative to an overpayment unrelated to acts or omissions of POWERbahn, or (2) the interest paid thereon exceed twelve percent (12%) per annum.

6.   *Invalidity and Unenforceability of the Licensed Intellectual Property.*

a.        If any court of competent jurisdiction renders a final decision that all claims relative to the Licensed Intellectual Property that covers a specific Licensed Product are invalid or unenforceable, the parties agree that the Royalty payments under section 4 herein for any Net Sales only in the country, state or region in which the decision regarding validity or unenforceability was made (the "Affected Region") shall be changed so that:  NAUTILUS shall pay to POWERbahn a "Know-How Royalty" of two and one-half percent (2.5%) of Net Sales of

15

the specific Licensed Product for a total of seven and one-half (7 ½ ) years subsequent to the date

that the order invalidating or finding the Licensed Intellectual Property to be unenforceable

becomes final.  The Royalty payments due relative to Net Sales of the Licensed Product in all

locations other than the Affected Region shall remain unchanged.

       b.             In the event that the Royalty owed POWERbahn based on the sales of the

Licensed Product does not exceed the Minimum Annual Royalty owed, NAUTILUS Minimum

Annual Royalty payment obligation shall be reduced by a pro-rated dollar-for dollar amount

commensurate with the reduction in Royalty payment obligations, based upon the previous year's

Net Sales in the Affected Region.  By way of example only, in the event the Licensed Intellectual

Property is held on September 30 to be invalid in Andorra, and the reduction from 5% to 2.5%

results in a reduction in Royalty payments from $50,000 to $25,000, then the Minimum Annual

Royalty payment for the remainder of the year shall be reduced by ¼ (Q4) of the $25,000

difference and by the full $25,000 for all following years.  In the event, there is no sales history

upon which to rely, the Minimum Annual Royalty payments shall not be reduced until twelve

months of Net Sales history has been established, after which a reduction shall be incorporated.

       c.            If the Licensed Intellectual Property is subsequently held valid or enforceable, the

Royalty rate will then immediately revert to the then applicable rate pursuant to this Agreement

(i.e., the ordinary course Royalty rate and not the Know-How Royalty rate) and the Minimum

Annual Royalty payment obligation shall revert to the then applicable amount pursuant to this

Agreement (i.e., the ordinary course Minimum Annual Royalty and not the pro-rated reduced

amount set forth in subsection (b) above).

       **7.**      *Confidentiality*

a.    <u>Confidential Information</u>.  For purposes hereof, the term "Confidential

Information" means any confidential information of POWERbahn or NAUTILUS including,

without limitation, all business and financial information relating to such party, all proprietary

information relating to the Intellectual Property Rights, Licensed Intellectual Property, Know-

How and any Licensed Product(s) or processes produced in connection therewith (excluding,

however, that portion of such proprietary information incorporated into an issued patent), and all

designs, inventions, discoveries, methods, plans, techniques, processes, documents, drawings,

data, samples, patent applications, trade secrets, know-how, and other information of the

disclosing party  and any other information or material considered proprietary by the disclosing

party; <u>provided</u>, <u>however</u>, that Confidential Information shall not include anything that (i) is or

lawfully becomes in the public domain, other than as a result of a breach of an obligation

hereunder; (ii) is furnished to the recipient by a third party having a lawful right to do so; or

(iii) was known to the recipient at the time of the disclosure.

b.    <u>Confidentiality Obligations</u>.  Each party shall for the term of this

Agreement and for a period of three (3) years thereafter (i) treat as confidential and preserve the

confidence of all Confidential Information of the other party; (ii) make no use of the other

party's Confidential Information except as expressly permitted under this Agreement; and

(iii) limit access to the other party's Confidential Information to the recipient's employees,

consultants and third parties bound by separate confidentiality agreements who reasonably

require access to such Confidential Information, and otherwise maintain policies and procedures

designed to prevent any unauthorized disclosure of the Confidential Information.  Each of

NAUTILUS and POWERbahn shall bear responsibility for the actions of its respective

17

employees, contractors, sublicensees, agents, affiliates and assigns for any improper use or disclosure of the other party's Confidential Information.

        c.      Return of Confidential Information.  Upon termination of this Agreement, each party shall promptly deliver to the other party all tangible and intangible embodiments, electronic or hard copy, including all copies, of the other party's Confidential Information.

        d.      Enforcement.  POWERbahn and NAUTILUS agree that either party will be irreparably harmed and money damages would be inadequate compensation to a party in the event the other party breaches any provision of this Section 7. Accordingly, notwithstanding the Dispute Resolution obligations set forth below, all of the provisions of this Section 6 shall be specifically enforceable, and each party shall be entitled to injunctive relief, specific performance or other equitable relief against the other party, without bond and without prejudice to any other rights and remedies that such party may have for a breach of this Agreement, in addition to other available monetary and other remedies, for the other party's (or successor or assignee of such party) breach of any provision of this Section 7.

    **8.**     ***Enforcement and Defensive Measures***

        a.      NAUTILUS shall have the first right, but no obligation, at its own discretion, to pursue any cause of action (including declaratory relief) regarding the Licensed Product.  NAUTILUS shall be solely responsible for all costs, fees, and expenses incurred in connection with such action(s).  In connection with any action(s) involving any of the Licensed Intellectual Property, any proceeds from such action(s) shall first be used to reimburse NAUTILUS for its reasonable third party costs, fees, and expenses. NAUTILUS agrees to pay POWERbahn thirty-five percent (35%) of the remaining proceeds.

b.      In the event that NAUTILUS elects not to pursue or fails to pursue a cause of action regarding the Licensed Product, POWERbahn shall have the right, but no obligation, to pursue such action(s) to the extent that any of the Licensed Intellectual Property is involved.  In that case, POWERbahn shall be solely responsible for all costs, fees, and expenses incurred in connection with such action(s), and POWERbahn shall be entitled to all proceeds from such action(s).

c.      The parties shall reasonably cooperate with one another in any intellectual property litigation regarding the Licensed Product or Licensed Intellectual Property.  Neither party shall settle a cause of action regarding any of the Licensed Product or Licensed Intellectual Property, nor make any admissions affecting the value of the Licensed Product, Licensed Intellectual Property, without first obtaining written  consent from the other party, which consent will not unreasonably be withheld or delayed, if such other party shall either (i) hold title to such Intellectual Property Rights, or (ii) shall be responsible hereunder for payment of any portion of such settlement or the costs or expenses related thereto; provided that such consent shall not be unreasonably withheld or delayed.

d.      NAUTILUS shall list POWERbahn as an additional insured party on NAUTILUS's product liability insurance for all of the Licensed Product in an amount not less than $2,000,000 per occurrence and $2,000,000 in the aggregate from an insurer rated by A.M. Best as not less than AAA.  Upon request, NAUTILUS will provide POWERbahn with a certificate of insurance to confirm compliance with the preceding sentence.

e.      NAUTILUS hereby indemnifies, defends and holds harmless POWERbahn, its officers, directors, shareholders, employees, representatives, consultants, customers, affiliates, successors, assigns and agents (each a "POWERbahn Indemnitee") against

all damages, claims, liabilities, losses and other expenses, including without limitation actual

attorneys' fees and costs, whether or not a lawsuit or other proceeding is filed, that arise out of or

relate to: (i) NAUTILUS' use of the Licensed Intellectual Property, (ii) the Licensed Product

(including, but not limited to, the use or sale/lease/loan of the Licensed Product); (iii)

NAUTILUS' transactions with third parties and/or the operation of its business; and/or (v)

NAUTILUS' gross negligence or willful acts or omissions. In the event NAUTILUS fails to

promptly indemnify and defend such claims and/or pay a POWERbahn Indemnitee's expenses,

as provided above, such POWERbahn Indemnitee shall have the right to defend itself, and in that

case, NAUTILUS shall reimburse such POWERbahn Indemnitee for all of its reasonable

attorneys' fees, costs and damages incurred in settling or defending such claims within thirty

(30) days of such POWERbahn Indemnitee's written requests. Except for where POWERbahn is

entirely inactive as an organization but for receipt of royalty payments under this Agreement,

POWERbahn hereby indemnifies, defends and holds harmless NAUTILUS, its officers,

directors, shareholders, employees, representatives, consultants, customers, affiliates, successors,

assigns and agents (each a "NAUTILUS Indemnitee") against all damages, claims, liabilities,

losses and other expenses, including without limitation actual attorneys' fees and costs, whether

or not a lawsuit or other proceeding is filed, that arise out of or relate to: (i) POWERbahn's use

of the Licensed Intellectual Property unrelated to NAUTILUS, (ii) POWERbahn's transactions

with third parties and/or the operation of its business; and/or (iii) POWERbahn's gross

negligence or willful acts or omissions. In the event POWERbahn fails to promptly indemnify

and defend such claims and/or pay a NAUTILUS Indemnitee's expenses, as provided above,

such NAUTILUS Indemnitee shall have the right to defend itself, and in that case, POWERbahn

shall reimburse such NAUTILUS Indemnitee for all of its reasonable attorneys' fees, costs and

damages incurred in settling or defending such claims within thirty (30) days of such

NAUTILUS Indemnitee's written requests.

### 9.     *Modifications, Enhancements and Derivative Works.*

a.  Title to the Licensed Intellectual Property shall always remain with

POWERbahn, and NAUTILUS shall not acquire any interest therein except the rights expressly

licensed pursuant to this Agreement.  The parties agree that POWERbahn shall solely own and

have exclusive worldwide right, title and interest in and to the Licensed Intellectual Property and to

all Know-How, modifications, enhancements, derivative works and Intellectual Property Rights

related thereto made in whole or in part by POWERbahn, NAUTILUS or associated or affiliated

third parties and their respective officers, directors, employees, contractors, authorized

sublicensees, agents, successors or assigns, all of which is made on a work made for hire basis for

POWERbahn and shall constitute additions to the Licensed Intellectual Property. By way of

example only, modifications, derivative works or improvements in software or circuitry or the

physical housing or connection of same to a piece of Exercise Equipment or other Licensed

Product would constitute a modification, enhancement or derivative work of the Licensed

Intellectual Property .  NAUTILUS shall not challenge, contest or otherwise impair POWERbahn's

ownership of the Licensed Intellectual Property, Know-How, additions thereto or the validity or

enforceability of POWERbahn's Intellectual Property Rights related thereto. Except as otherwise

permitted herein, POWERbahn shall not use any trade name, corporate name, business name,

trademark or service mark of NAUTILUS, or any confusingly similar mark or name in connection

with the marketing, advertising, sale or distribution of POWERbahn's products and services.

21

b.      Except with respect to the Licensed Intellectual Property and POWERbahn's Know-How which may be included in a Licensed Product, such as Software, title to the Licensed Product shall always remain with NAUTILUS, and POWERbahn shall not acquire any interest therein.  The parties agree that, except with respect to the Licensed Intellectual Property and POWERbahn's Know-How, NAUTILUS shall solely own and have exclusive worldwide right, title and interest in and to the Licensed Product, and to all modifications, enhancements and derivative works thereof made by Licensee, and to all Intellectual Property Rights related thereto made in whole or in part by either/or POWERbahn/NAUTILUS, or a third party, and their respective officers, directors, employees, contractors, authorized sublicensees, agents, successors or assigns, all of which is made on a work for hire basis for NAUTILUS, POWERbahn shall not challenge, contest or otherwise impair NAUTILUS' ownership of the Licensed Product or the validity or enforceability of NAUTILUS' Intellectual Property Rights related thereto. By way of example only, improvements to handlebars or bicycle pedals would constitute a modification, enhancement or derivative work of the Licensed Product. Except as otherwise permitted herein, NAUTILUS shall not use any trade name, corporate name, business name, trademark or service mark of POWERbahn, or any confusingly similar mark or name in connection with the marketing, advertising, sale or distribution of the Licensed Product.

c.      Except as provided in Section 8 above, POWERbahn shall be solely responsible for the filing, maintenance, continuation and prosecution/protection of all Intellectual Property Rights relating to or arising out of the Licensed Intellectual Property; provided, however, that NAUTILUS shall have the right to review, in a reasonable time period, and timely provide in writing substantial and meaningful consultation on all related patent applications made or to be made by POWERbahn, including, but not limited to, what elements are to be the subject of the

22

application and the jurisdictions in which such application is to be filed. NAUTILUS shall reimburse POWERbahn on or before 30 days after NAUTILUS' receipt of a written statement from POWERbahn detailing all reasonable fees and reasonable costs (a fair measure of such reasonable fees and costs being the hourly rate of Dorsey & Whitney LLP and costs incurred by Dorsey & Whitney LLP for similar projects) that it incurs in connection with: (i) those portions or elements of each such application in which the application is to be filed and/or (ii) filing and other fees for jurisdictions for which NAUTILUS gave its approval. With respect to those portions or elements of an application for which NAUTILUS reimburses POWERbahn, such portions or elements shall be added to or included within the Licensed Intellectual Property that is licensed to NAUTILUS hereunder within those jurisdictions for which NAUTILUS reimburses POWERbahn for the associated application filing and other fees.  POWERbahn shall have the right to include in a given application elements or portions that NAUTILUS does not approve at POWERbahn's sole expense and such elements or portions shall not be added to or included within the Licensed Intellectual Property that is licensed to NAUTILUS hereunder.  POWERbahn shall have the right to file an application in jurisdictions that NAUTILUS does not approve at POWERbahn's sole expense and NAUTILUS shall have no right, title or interest in or to the subject matter of such application within those jurisdictions.

      d.     Except as provided in Section 8 above, NAUTILUS shall be solely responsible for the filing, maintenance, continuation and prosecution/protection of all Intellectual Property Rights relating to or arising out of the Licensed Product, provided, however, that to the extent that a given patent application incorporates any of the Licensed Intellectual Property, POWERbahn shall have the right to review, in a reasonable time period, and timely provide in writing substantial and meaningful consultation on such application. The above notwithstanding,

23

and regardless of the content of a given application, nothing provided in this subsection (d) shall grant any right, title or ownership interest in and to the Licensed Intellectual Property to NAUTILUS.

      e.      Nothing in this Section shall be interpreted as a carve-out of the exclusive license granted in this Agreement, nor a license back, whether implicit or explicit, of any rights exclusively licensed to NAUTILUS under this Agreement.

      **10.**    *Termination*

      a.      This Agreement shall be operative as of the date first set forth above and, unless otherwise terminated in accordance with this Agreement, this Agreement shall expire on the 20th anniversary of the date first set forth above; provided that NAUTILUS may elect to terminate this Agreement at any time after three (3) years from the date first written above upon ninety (90) days' advance written notice to POWERbahn, providing that NAUTILUS shall pay no less than the Royalties due pursuant to the term of this Agreement through the end of the quarterly period in which the ninety (90) day termination date falls.

      b.      If NAUTILUS breaches its obligation to timely make any payments or reports in accordance with the terms of this Agreement, POWERbahn may terminate the License Agreement after it provides thirty (30) days' written notice to NAUTILUS regarding said breach unless, before the end of the 30-day period, NAUTILUS has cured the breach and so notifies POWERbahn in writing, stating the manner of the cure.

      c.      If either party materially breaches this Agreement, the other party may terminate this Agreement only after the breaching party has been notified of the breach in writing and has failed to cure the breach within sixty (60) days of receiving written notice of same.

d.      The above notwithstanding, this Agreement may be terminated: (i) by either party in the event that the other party breaches any of its obligations hereunder and fails to timely cure such breach as provided for herein; (ii) upon the mutual written agreement of the parties; or (iii) immediately upon (1) the actual breach by the other party of its confidentiality or trade secret protection obligations hereunder, (2) the insolvency or bankruptcy of the other party, (3) the other party's commission of an act of fraud, whether prior to or subsequent to the date hereof, upon the non-breaching party, or (5) the other party's gross negligence or willful misconduct relative to the non-breaching party and/or the Licensed Intellectual Property. This Agreement shall be effectively terminated upon the date of the non-breaching party's written notice of termination to the other party.

e.      If either party terminates this Agreement for any reason, NAUTILUS shall have a sell-off period from the date of termination, which shall not exceed  twelve (12) months in length. During this sell-off period, NAUTILUS shall not manufacture additional inventory of Licensed Products (except as stated below), but shall have the right to sell its current and existing inventory of Licensed Products, provided that the sales price of each item of such current and existing inventory shall not be less than 75% of the sales price for such item (priced and distributed in a manner consistent with NAUTILUS' business practices immediately prior to the termination of this Agreement). Subject to the terms of the immediately preceding sentence, NAUTILUS may utilize any raw materials that it has on hand on the termination date to build additional wholegoods inventory that it may sell during the sell-off period. NAUTILUS shall continue to be subject to its Royalty reporting and payment obligations concerning any such post-termination sales. Subject to the foregoing 12-month sell-off period, in the event of the termination of this Agreement, NAUTILUS shall not sell, license, lease, exchange, loan any

25

goods that use or include Licensed Intellectual Property or otherwise generate any revenue for itself from or related to the Licensed Intellectual Property (with any such revenue to be held in trust for the benefit of POWERbahn and promptly paid over to POWERbahn). Subject to the above, after termination or expiration NAUTILUS shall have the continuing right and license to provide service and support for any Licensed Product sold or otherwise distributed by NAUTILUS during the term of this Agreement or any related sell-off period.

    f.  Upon expiration (as opposed to termination) of this Agreement, NAUTILUS shall remain obligated to pay POWERbahn Royalties on subsequent sales of any Licensed Product manufactured prior to expiration of this Agreement and to reimburse POWERbahn for all actual expenses incurred and reimbursable hereunder.

    g.  In no event shall either party be liable to the other for any amounts representing indirect, special, exemplary consequential or punitive damages, arising from the performance or non-performance of this Agreement.

**11.**  ***Other Provisions***

    a.  <u>Notices</u>. All notices, reports, records, or other communications which are required or permitted to be given to the parties under this Agreement shall be sufficient in all respects if given in writing and delivered in person, by telecopy (with evidence of transmission), or by overnight courier, to the receiving party at the address listed on the first page of this Agreement or to such other person and/or address as such party may have given to the other by written notice pursuant to this Section. Notice shall be deemed given on the date of delivery, in the case of personal delivery, telecopy or overnight courier.

    b.  <u>Entire Agreement</u>. This Agreement and the NDA contains the final, entire and complete understanding between the parties as to the subject matter of this Agreement and

26

the NDA and merges and supersedes all prior discussions between them and/or their respective

counsel, and neither of the parties shall be bound by any conditions, definitions, warranties, or

representations with respect to the subject matter of this Agreement and the NDA, other than as

expressly provided in this Agreement or the NDA or as duly set forth on or subsequent to the

date hereof in writing signed by the parties.

       c.      <u>Amendments.</u>  This Agreement may not be modified or terminated orally,

and no claimed amendment, rescission or waiver shall be binding on a party unless in writing

signed by a duly authorized representative of the party.

       d.      <u>No Assignment</u>.  Neither this Agreement nor any portion of it may be

assigned without the written consent of both parties, unless the assigning party is assigning this

Agreement in connection with the transfer:  (i) of its rights and obligations hereunder to a

wholly-owned subsidiary, or (ii) to a third party purchaser of substantially all of its assets,

provided that any permitted assignee must expressly agree in writing to be bound by the terms of

this Agreement and assume all obligations of the assignor hereunder.

       e.      <u>No Joint Venture.</u>  Nothing herein contained shall be construed to place

the parties in the relationship of partners or joint ventures or agents.

       f.      <u>Binding Effect</u>.  The provisions of this Agreement shall be binding upon

and inure to the benefit of each of the parties and their respective successors and assigns

permitted under this Agreement and each party shall affirmatively bind any such successors and

assigns to the terms and conditions of this Agreement.

       g.      <u>No Waiver</u>.  The failure of one of the parties to insist upon the strict

performance of any provision of this Agreement or to exercise any right, power, or remedy upon

a breach thereof shall not constitute a waiver of that or any other provision of this Agreement or limit that party's right thereafter to enforce any provision or exercise any right.

      h.      <u>Rules of Construction</u>. The following rules shall govern the interpretation and construction of this Agreement:

      (1)      All headings for articles and sections are for convenience only and shall not limit, alter, or otherwise affect the construction or interpretation of this Agreement.

      (2)      Whenever the context so requires, the neutral gender shall include the feminine or masculine, the feminine shall include the masculine and vice versa, and the singular number shall include the plural and vice versa.

      (3)      If any provision of this Agreement as applied to any party or any circumstance shall be adjudged by a court to be unlawful, void, or for any reason unenforceable, such provision shall be deemed separable from the remainder of this Agreement and the same shall in no way affect the validity or enforceability of any other provision of this Agreement, the application of such provision to other parties or circumstances, or the validity or enforceability of this Agreement as whole.

      (4)      Any rule of construction disfavoring the drafting party shall not apply in the construction of any provision of this Agreement.

      i.      <u>Counterparts/Facsimile</u>. This Agreement may be executed in two or more counterparts and by facsimile, all of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

      j.      <u>Authority Warranty</u>. Each of the persons signing below warrants that he is duly authorized to sign this Agreement on behalf of the party for which he is signing.

k.    Dispute Resolution. Except for the enforcement of the provisions of Section 6 which is specifically excluded from the scope of this paragraph, the parties shall attempt to have all disputes, controversies or claims between the parties arising under or related to this Agreement, including its breach, termination or validity, resolved by at least one (1) day of mediation in either Boulder or Denver, Colorado before any other legal proceedings are initiated by either party.

l.    Attorneys' Fees. If a party shall commence any arbitration or court action or proceeding against another party in order to enforce the provisions of this Agreement or to recover damages as a result of the alleged breach of any of the provisions of this Agreement, the prevailing party shall be entitled to recover all reasonable costs in connection therewith, including reasonable attorneys' fees.

m.    Further Assurances. The parties shall cooperate fully with each other and execute such further instruments, documents, and agreements, and shall give such further written assurances, as may be reasonably requested by the other party to better evidence and reflect the transactions described herein and contemplated hereby, and to carry into effect the intent and purposes of this Agreement.

n.    Survival of Terms and Conditions. Except as otherwise specifically provided for in this Agreement, the terms and conditions of this Agreement shall survive the expiration or termination of this Agreement to the full extent necessary for their enforcement and for the protection of the party in whose favor they operate.

o.    Applicable Law. This Agreement, and all matters relating hereto, including any matter or dispute arising out of the Agreement, shall be interpreted, governed, and enforced according to the laws of the State of Washington, excluding any conflicts of law rules

29

that may require application of the laws of any other state or country, and the parties hereto consent to the jurisdiction of any appropriate court in the State of Washington to resolve such disputes.

p.    Force Majeure.  Neither party shall have any liability for delays or failures in performance of any obligation under this Agreement that are cause by any act or occurrence that is beyond the reasonable control or anticipation of such party, including but not limited to fire, flood, earthquake or other natural disaster, shortages of materials, labor disputes, war or civil disturbance, terrorist act or objective threat of a terrorist act, or interruption of transportation facilities.  Such party's performance shall be excused for the time that any such event continues to occur.

r.    Cumulative Remedies.  Nothing in this Agreement shall be construed to suggest that termination of this Agreement shall be the exclusive remedy of a non-breaching party to this Agreement.  Each party shall have all remedies available at law or in equity for breach of this Agreement, all of which remedies shall be cumulative.

s.    Executory Contract. The license granted to NAUTILUS hereunder is and will be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, as it may be amended, a license of rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code.  The parties further agree that a reasonable amount of time for this license to be accepted or rejected is 120 days after the filing of a voluntary petition commencing a bankruptcy case.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first written above.

**Nautilus, Inc.**

By: _____
Name: _Pat Warner_____
Title: _SVP Product Dev._____

**POWERbahn, LLC**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first written above.

**Nautilus, Inc.**

By: _____
Name: _____
Title: _____

**POWERbahn, LLC**

By: _____
Name: _SCOTT RADOW_
Title: _MANAGER_

31

EXHIBIT A
EXCLUSIVE LICENSE AGREEMENT
POWERbahn – NAUTILUS

1.  U.S. Patent Application Serial No. 60/088662, filed June 9, 1998

2.  U.S. Patent Application Serial No. 09/326941, filed June 7, 1999

3.  U.S. Patent Application Serial No. 09/882517, filed June 15, 2001

4.  U.S. Patent Application Serial No. 10/209539, filed July 30, 2002

5.  U.S. Patent Application Serial No. 10/724,988, filed December 1, 2003

6.  U.S. Patent No. 6,454,679

7.  U.S. Patent No. 6,676,569

8.  U.S. Provisional Patent Application filed on December 22, 2005, entitled:
    Exercise Device, Express Mail Number: EV537056845US, (Atty. Docket No.
    RAD04PP302)


Additional intellectual property filings/registrations

U.S. Trademark Serial No. 75/810498, Word Mark: POWERBAHN, filed
October 21, 1999, Registration Date: April 23, 2002

U.S. Copyright Serial No. Txu-1-255-384, software: filed August 22, 2005.

4849-1015-4240\5 12/22/2005 5:38 PM

*Powerbahn NDA*

EXHIBIT B
EXCLUSIVE LICENSE AGREEMENT
POWERbahn - NAUTILUS
**POWERBAHN LLC**
**RECIPROCAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT**

WHEREAS, the parties have entered into discussions regarding the possible transaction between them whereby Powerbahn will license certain of its intellectual property rights to the Undersigned for use by the Undersigned in the manufacture and commercial exploitation of Exercise Equipment (the "Transaction"); and

WHEREAS, Powerbahn and the Undersigned have not yet finalized or executed the definitive agreement(s) between them to evidence the Transaction; and

WHEREAS, the Undersigned has requested that prior to executing the definitive agreement(s), Powerbahn provide it with certain Confidential Information as well as physical manifestations, prototypes and production models of potential Exercise Equipment that contains Powerbahn's intellectual property for testing purposes only (and not for purposes of effecting legal delivery from Powerbahn to the Undersigned) in order to fully evaluate the feasibility of the Transaction; and

WHEREAS, as a condition precedent to Powerbahn providing the Undersigned with the items referenced in the immediately preceding paragraph, the Undersigned must execute and deliver to Powerbahn this Agreement; and

WHEREAS, in addition to as set forth above, the parties recognize that, in order to fully evaluate the feasibility of the Transaction, the parties have in the past and will in the future be required to disclose certain Confidential Information to one another; and

WHEREAS, the parties each agree that all disclosure of such information will be done only on a strictly confidential basis as hereinafter provided.

NOW, THEREFORE, in consideration of the parties' reciprocal disclosure of Confidential Information, Powerbahn and the Undersigned agree to be bound by all of the following terms and conditions.

1. <u>Definitions.</u>

1.1 "Agreement" means this Reciprocal Confidentiality and Nondisclosure Agreement.

1.2 "Powerbahn" means PowerBahn LLC, a Florida limited liability company, and its predecessors, successors, affiliates, and their employees, officers and directors, agents, consultants, advisors, attorneys, accountants or independent contractors or any subsidiary or other affiliate of the foregoing including their employees, officers and directors, agents, consultants, advisors, attorneys, accountants, or independent contractors who disclose information to the Undersigned for the purposes of this Agreement.

1.3 "Undersigned" means: (a) the corporation executing this Agreement below as the Undersigned and includes the employees, officers and directors, agents, consultants,

advisors, attorneys, accountants or independent contractors of the Undersigned or any subsidiary or other affiliate of the Undersigned including their employees, officers and directors, agents, consultants, advisors, attorneys, accountants, or independent contractors who disclose information to Powerbahn for the purposes of this Agreement; or (b) the individual executing this Agreement below as the Undersigned and includes all members of such persons family and their partners, agents, employees, consultants, or independent contractors, and, if not a natural person includes the employees, officers and directors, shareholders, partners, agents, consultants or independent contractors of the Undersigned or any subsidiary or other affiliate of the Undersigned including their employees, officers and directors, shareholders, partners, agents, consultants or independent contractors.

      1.4    "Discloser" means the party disclosing Confidential Information to the other party.

      1.5    "Recipient" means the party receiving Confidential Information from the other party.

      1.6    "Confidential Information" means any and all confidential and/or proprietary knowledge, data or information of Discloser, whether or not marked as "confidential" or "proprietary," whether or not reduced to writing or other tangible form, which is disclosed to or obtained by Recipient in connection with the activities contemplated by this Agreement. Confidential Information includes, without limitation, all of the following: ideas, animation, drawings, storyboards, characters, plot lines, stories, story ideas, scripts, treatments, audio/visual entertainment and/or educational content; computer code (including source code, object code), specifications, schematics, processes, procedures, techniques, designs, drawings, techniques, products, models, know-how, testing methods, data, marketing plans, financial data, customer lists, referral and vendor sources, documentation, diagrams, flow charts, research, development, experimental work, clinical data, new product or new service ideas, information, or technologies, product prototypes, product copies, manufacturing, fabrication, development or marketing techniques and materials, development or marketing timetables, strategies and business and development plans, including trade names, trademarks, patentable and copyrightable materials, inventions (whether patentable or not), customer, supplier or personal names and other information related to customers, suppliers or personnel, pricing policies and financial information, licenses, prices, costs, business plans and other information of a similar nature and any and all other trade secrets or nonpublic business information of Discloser. Confidential Information also includes the manner in which any of the above-described items may be combined with other information or products or synthesized or used by Discloser.

      1.7    Confidential Information does not include any information which: (a) was in the lawful and unrestricted possession of Recipient prior to its disclosure by Discloser; (b) is or becomes generally available to the public by acts other than those of Recipient after receiving it; (c) has been received lawfully and in good faith by Recipient from a third party who did not derive it from Discloser; or (d) is shown by acceptable evidence to have been independently developed by the Recipient.

2. Obligations Recipient will hold in complete confidence and not disclose, produce, publish, permit access to, or reveal the Confidential Information disclosed hereunder, at any time prior to Discloser's intentional public disclosure of that information, without the express prior written consent of Discloser. Additionally, Recipient agrees to use at least the same degree of care, but no less than a reasonable degree of care, to avoid unauthorized disclosure or use of the Confidential Information as Recipient employs with respect to its own proprietary information of like importance.

2.2     Recipient will not copy, photograph, photocopy, alter, modify, disassemble, reverse engineer, decompile, or in any manner reproduce any materials containing or constituting Confidential Information without the express prior written consent of Discloser, and will return all such materials, together with any copies thereof, immediately after the purposes for which they were furnished under Section 2.5 hereof have been accomplished, or upon the request of Discloser; provided, however, that Recipient may reproduce and distribute Confidential Information to its employees and advisors as Recipient deems reasonably necessary to accomplish the purposes for which the Confidential Information was provided under Section 2.5.   Recipient shall be responsible for any breach of this Agreement by its employees or advisors.   Additionally, upon request of Discloser, Recipient will destroy materials received or prepared by Recipient that contain Confidential Information.

2.3     Recipient will not publish any review, notice or other report concerning any Confidential Information prior to Discloser's intentional public disclosure of that Confidential Information, at which time it will no longer be Confidential Information to the limited extent that it is actually publicly disclosed.   Reviews, notices or other reports concerning Confidential Information which are not authorized by Discloser and which appear prior to Discloser's intentional public disclosure of such Confidential Information will not release Recipient from any of its obligations hereunder.

2.4     Disclosure of Confidential Information is not precluded if such disclosure is in response to a valid order of a court or other governmental body of the United States or any political subdivision thereof; provided that Recipient will first give notice to Discloser and make a reasonable effort to obtain a protective order requiring that the Confidential Information be disclosed only for limited purposes for which the order was issued.

2.5     Recipient shall use the Confidential Information only for the purpose of evaluating the Transaction. Recipient shall not disclose Confidential Information to any third party (including subcontractors) without first obtaining Discloser's written consent and shall disclose Confidential Information only to its own employees having a need to know.   Recipient shall promptly notify Discloser of any items of Confidential Information prematurely disclosed.

2.6     Without the prior consent of the other party, neither party will, and will direct their employees, agents and advisors not to, disclose to any person (a) the fact that discussions or negotiations are taking place concerning a possible transaction between the parties, (b) that either party has requested or received Confidential Information from the

{6221.001-00248430.DOC-2 0}                                3

other party or (c) or any of the terms, conditions or other facts with respect to any such possible transaction, including the status thereof. The term "person" as used in this Agreement will be interpreted broadly to include, without limitation, any corporation, company, partnership, limited liability company, joint venture or individual.

2.7    Until the earliest of (a) the execution by the parties of a definitive agreement; or (b) three years from the date of this Agreement, the parties hereto agree not to initiate or maintain contact (except for those contacts made in the ordinary course of business) with any officer, director or employee of the other party regarding its business, operations, prospects or finances, except: (i) with respect to only for the purpose of evaluating the Transaction and (ii) with the express permission of such party.

2.8    The parties understand and acknowledge that neither party is making any representation or warranty, expressed or implied, as to the accuracy or completeness of the Confidential Information or of any other information provided or prepared by or for either party pursuant to this Agreement, and neither of the parties, nor any of their officers, directors, employees, stockholders, owners, affiliates or agents, will have any liability to either party or any other person resulting from use of the Confidential Information or any such other information.

3. Reservation of Rights.  Notwithstanding the fact that Confidential Information may be disclosed to Recipient subject to this Agreement, Recipient understands and agrees that all such Confidential Information shall remain the property of Discloser. No rights or obligations other than those expressly recited herein are to be implied from this Agreement. No license is hereby granted, directly or indirectly, to any of the Confidential Information.

4. Injunctive Relief.  Each party understands and acknowledges that the Confidential Information has been developed or obtained by Discloser by the investment of significant time, effort and expense and provides Discloser with a significant competitive advantage in its business.  If Recipient fails to comply with any obligations hereunder, Discloser will suffer immediate, irreparable harm for which monetary damages will provide inadequate compensation.  Accordingly, the parties hereto agree that the Discloser will be entitled, in addition to any other remedies available to it, at law or in equity, to injunctive relief to specifically enforce the terms of this Agreement.

5.    Term.  This Agreement shall remain in effect for a period of five (5) years after the date of this Agreement or until all Confidential Information known to Recipient ceases to be within the definition of Confidential Information set forth above, whichever is larger.

6. Miscellaneous.

6.1    Construction.  The section and subsection headings used herein are for convenience or reference only, are not a part of this Agreement and are not to affect the construction of, or be taken into consideration in interpreting, any provision of this Agreement.   In the interpretation and construction of this Agreement, the parties acknowledge that the terms hereof reflect extensive negotiations between the parties and

that this Agreement shall not be deemed, for the purpose of construction and interpretation, that either party drafted this Agreement.

6.2    Governing Law, Jurisdiction and Venue.   The parties hereto agree that this Agreement will be governed by and construed in accordance with the laws of the State of Washington without reference to its choice of law rules and as if wholly performed within the State of Washington.   The parties further agree that any litigation regarding the interpretation, breach or enforcement of this Agreement will be filed in and heard only by the state or federal courts with jurisdiction to hear such disputes in Clark County, Washington, and the parties hereby expressly submit to the jurisdiction of such courts.

6.3    Attorney's Fees.   If any judicial or other proceeding is brought by either party regarding the interpretation or enforcement of this Agreement, the prevailing party will recover from the other all costs, attorneys' fees and other expenses incurred by the prevailing party with regard to that proceeding, and the right to such costs, attorneys' fees and other expenses shall be deemed to have accrued upon the commencement of said proceeding and shall be enforceable whether or not said proceeding is prosecuted to judgment.

6.4    Entire Agreement.   This Agreement sets forth the entire understanding and agreement between the parties with respect to the exchange of Confidential Information and supersedes all other oral or written representations and understandings.   This Agreement may only be amended or modified by a writing signed in advance by Powerbahn and the Undersigned.

6.5    Severability.   The parties agree that this Agreement is severable and that in the event any provision of this Agreement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions will not be affected or impaired. Additionally, the parties expressly grant to any court or other entity interpreting this Agreement the power and authority to modify the terms of this Agreement to extent necessary to allow enforcement of this Agreement to the fullest extent allowed by law.

6.6    Successors and Assigns.   This Agreement is binding upon successors, assigns and legal representatives of Powerbahn and the Undersigned, and protects Confidential Information of any successors or assigns of the Undersigned or Powerbahn.

6.7    Notice.   Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be effective (a) upon hand delivery or delivery by facsimile at the address or number designated below the signature of the parties (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second (2nd) business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. Any party hereto may from time to time change its address for notices by giving at least ten (10) days' written notice of such changed address to the other party hereto.

6.8    Counterparts/Facsimile.    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument.  The parties hereto, and their respective successors and assigns, are hereby authorized to rely upon the signature of each person and entity on this Agreement, which are delivered by facsimile, as constituting a duly authorized, irrevocable, actual, current delivery of this Agreement with original ink signatures of each such person and entity.

6.9    Authority.    Each of the persons executing this Agreement represents and warrants that he/she is authorized to execute on behalf of, and to therefore bind, the entity, if any, indicated below.

IN WITNESS WHEREOF, each of the parties has executed this Agreement on July 12, 2005.

**POWERBAHN:**

PowerBahn LLC, a Florida limited liability company

By: _Scott Radow_
Name: SCOTT RADOW
Title: MANAGER
**Address and Facsimile:**
1340 LINCOLN ROAD, #403
MIAMI BEACH, FL 33139

**UNDERSIGNED:**

Nautilus, Inc., a Washington corporation

By: _Pat Warner_
Name: Pat Warner
Title: SUP Product Dev.
**Address and Facsimile:**
1886 Prairie Way
Louisville, CO 80027
303-545-1428